IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**JUSTIN WAYNE SMITH,**

    **Plaintiff,**

**v.**           **Civil Action No. 3:10-CV-703-L-BK**

**KAUFMAN COUNTY SHERIFF'S
OFFICE, et al.,**

    **Defendants.**

## FINDINGS, CONCLUSIONS AND RECOMMENDATION

  This case has been referred to the undersigned for pretrial management.  (Doc. 19).  The

cause is now before the Court on Defendants' motions for summary judgment.  (Docs. 46, 61).

This is a 42 U.S.C. § 1983 case arising out of Defendants' alleged deliberate indifference to

Plaintiff's serious medical needs.  Plaintiff initially sued the Kaufman County Sheriff's Office,

Sheriff David A. Byrnes, Dr. William J. Fortner, Captain Lori Compton, and Nurse Cindy

Martinez.  The district court summarily dismissed the case against the Kaufman County Sheriff's

Office with prejudice, so only the individual Defendants remain parties to the suit.  (Doc. 17).

Upon review, it is recommended that Defendants' motions for summary judgment be

**GRANTED IN PART AND DENIED IN PART,** as set out below.

### I. BACKGROUND

  In his *pro se* complaint, filed April 7, 2010, Plaintiff alleged that when he arrived at the

Kaufman County Jail as a pretrial detainee, Defendants knew that he had a medical condition

called ulcerative colitis.[1]  (Doc. 2 at 1).  He contended that he informed the jail's medical

_____

  [1]Ulcerative colitis is defined as "a chronic disease of unknown cause characterized by
ulceration of the colon and rectum, with rectal bleeding, mucosal crypt abscesses, inflammatory

provider, Dr. Fortner, that he was having a flare-up of his disease and needed medical treatment from a gastroenterologist, which Dr. Fortner refused for several months.  (*Id.* at 1-3; Doc. 9 at 2-3).  He also alleged that Dr. Fortner gave him an inadequate dosage of Prednisone, the drug needed to treat Plaintiff's disease, and the delays in providing his treatment ultimately led to him having to have his entire large intestine removed through a procedure called a Brooke ileostomy.[2] (Doc. 9 at 2-4).  Plaintiff maintained that Nurse Martinez, thereafter, allowed Plaintiff to lie in his own feces for several days, and then refused to allow Plaintiff to use a wheelchair so he could keep an appointment with the jail psychologist.  (Doc. 2 at 3).  As to Captain Compton, Plaintiff alleged that his mother called and wrote to her on several occasions about Plaintiff's medical problems, and Captain Compton responded in writing that Plaintiff's medical treatment was adequate.  (*Id.* at 3).  Further, Plaintiff alleged that his attorney wrote to Sheriff Byrnes advising him that Plaintiff needed medical treatment, but Sheriff Byrnes had a practice of permitting the jail's medical providers to ignore sick inmates' needs.  (*Id.*; Doc. 14 at 2).  This Court appointed counsel to represent Plaintiff in September 2010.  (Doc. 37).

Defendants have now moved for summary judgment.  During the timeframe of this suit, Nurse Martinez was the medical nursing supervisor of all jail medical staff, and she reported directly to Captain Compton.  (Martinez depo. at 6-10, Plaintiff's App'x. 74; Compton depo. at 9, Plaintiff's App'x. 109).  Dr. Fortner provided contract medical services to the jail's inmates

---

pseudopolyps, abdominal pain, and diarrhea."  STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000) (available on Westlaw).

[2] A Brooke ileostomy is a procedure during which the ileum (the longest part of the small intestine) is brought to the abdomen wall and sutured to the skin so that the ileum discharges waste directly outside the body.  STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

two days a week and was also the jail's on-call physician. (Martinez depo. at 8, Plaintiff's

App'x. 74).      The evidence the parties have submitted to the Court reveals the following

chronology of events:  Plaintiff experienced two previous flare-ups of his ulcerative colitis – one

in 2001 or 2002 when he was 15 years old, and a second in 2006. (Smith depo. at 9-21,

Plaintiff's App'x. 122-25).  Both flares were resolved when gastroenterologists administered

high dosages (at least 40milligrams) of Prednisone. (Smith depo. at 9-20, 41, Plaintiff's App'x.

122-25, 129).

Plaintiff was incarcerated at the Kaufman County Jail in September 2007 at the age of 21.

(Def't's App'x. at 1-2).  Defendants Martinez, Compton, and Byrnes acknowledge in their

summary judgment brief that they knew of Plaintiff's ulcerative colitis at that time. (Doc. 46 at

3, 17; *see also* Martinez depo. at 69-70, Plaintiff's App'x. 82-83).  Plaintiff was on the

prescription medicine Sulfasalazine, which Dr. Fortner and Nurse Martinez knew he took to keep

his ulcerative colitis in remission. (Fortner depo. at 29, Plaintiff's App'x. 19, 45; Martinez depo.

at 70-72, Plaintiff's App'x. 83).

In November 2007, Captain Compton investigated a written complaint from Plaintiff's

mother that his Sulfasalazine was being withheld from him due to an allegation that he had been

hoarding it. (Compton depo. at 23-25, Plaintiff's App'x. 112; Saldeen complaint form,

Plaintiff's App'x. 116; Letter from Captain Compton, Plaintiff's App'x. 117).  Nurse Martinez

testified that Dr. Fortner had written the order to discontinue Plaintiff's Sulfasalazine due to the

hoarding allegation. (Martinez depo. at 184-186, Plaintiff's App'x. 106-107).  Plaintiff received

a disciplinary report for hoarding, but was found not guilty. (Smith depo. at 98, Plaintiff's

App'x. 140).  After a week or two, he got back on the Sulfasalazine. (Smith depo. at 70-71,

Deft's App'x. 12).

Plaintiff's ulcerative colitis flared up on Christmas Eve 2007.  (Smith depo. at 30-31, Plaintiff's App'x. 127).  He had blood in his stools, urgency to defecate, multiple bowel movements per day, and diarrhea.  (*Id.* at 33-34, App'x. 127-28).  Plaintiff was not able to see Dr. Fortner until January 2, 2008, at which point Plaintiff told Dr. Fortner that he had blood in his stools.  (*Id.* at 33-37, Plaintiff's App'x. 127-28).  Dr. Fortner did not (1) do any blood tests, (2) determine the albumin level in Plaintiff's blood, (3) ask about the number of bowel movements Plaintiff was having per day, (4) ascertain Plaintiff's inflammation level, (5) ascertain his hemocrit percentage, (6) take his body temperature, (7) examine a stool sample, or (8) order a colonoscopy.  Dr. Fortner testified that Plaintiff did not need those tests because he was merely having a flare-up of his disease, and he did not believe Plaintiff had severe ulcerative colitis since his primary complaint was anxiety and depression, and he did not appear severely ill. (Fortner depo. at 31, 34, 37, 45, 49-50, 69, Plaintiff's App'x. 20-21, 23-25, 29).  Dr. Fortner also stated that he did not ask about Plaintiff's pain or weight loss because he did not have time to ask patients about every symptom they might have.  (Fortner depo. at 91-92, Plaintiff's App'x. 34, 38).  Plaintiff's pulse that day was 112.  (Fortner depo. at 40-41, Plaintiff's App'x. at 22). Plaintiff's Medical Data form for that date states that Plaintiff "is a male who I was asked to see for the evaluation of colitis" because he was in pain and passing blood.[3]  Dr. Fortner denied that he wrote that statement and did not know who did.  (Fortner depo. at 51-55, Plaintiff's App'x.

---

[3] There are two versions of this document in the record.  One is undated, and one includes a handwritten date that is partially obscured and may read "1/24/2008."  This latter date appears to be a scrivener's error as it is apparent from the context and the remainder of the record that this sick call took place on January 2, 2008.  (Plaintiff's App'x. at 48-49).

25-26, 48; *see also* Deft. App'x. at 36 (clinic visit note by Dr. Fortner stating that Plaintiff asked

to be seen for anxiety and depression, and he also had some blood in his stool for which he

requested Prednisone).

That same day, Plaintiff asked Dr. Fortner to send him to a gastrointestinal specialist, but

Dr. Fortner refused.  (Smith depo. at 35-37, 39-41, 117-27, Plaintiff's App'x. 128-29, 142-45;

*Statement of Claim* (Doc. 9), Plaintiff's App'x. 59).  Although Dr. Fortner denied it, Plaintiff

testified that Dr. Fortner berated him when he asked to see a specialist, shouting that his request

was "ridiculous."  (Fortner depo. at 107, Plaintiff's App'x. 37; Smith depo. at 119, Plaintiff's

App'x. 143; *see also* Plaintiff's sworn *Statement of Claim*, Doc. 9 at 2 (stating that Dr. Fortner

yelled at Plaintiff "Your request to see a G.I. is ridiculous!  You should not have committed a

crime if you were worried about seeing a specialist!").

After Dr. Fortner refused to send Plaintiff to a specialist, Plaintiff asked Dr. Fortner to

place him on a daily 40 milligrams dosage of Prednisone.  (Smith depo. at 74-77, Plaintiff's

App'x. 136).  Dr. Fortner refused and, after arguing with Plaintiff, instead put him on 20

milligrams of Prednisone and tapered it rapidly over a period of 12 days, by five milligrams every

three days because he was concerned about the potentially severe side effects of a higher dosage.

(Fortner depo. Ex. 27, Plaintiff's App'x. 56; Fortner depo. at 58, 65-66, Plaintiff's App'x. 27-

29).  Plaintiff testified that he thought Dr. Fortner was angry with him because he had requested

to see a specialist, and that is why Dr. Fortner refused to give him 40 milligrams of Prednisone.

(Smith depo. at 127, Plaintiff's App'x. 145).

After Plaintiff's initial visit on January 2, 2008, neither Dr. Fortner nor Nurse Martinez

monitored Plaintiff's health status and did not see him for approximately six weeks.  (Fortner

depo. at 75, 77, 94-95, Plaintiff's App'x. 31, 35; Martinez depo. at 77-78, 86-87, 90-91, 105-07, Plaintiff's App'x. 84-85, 87-88, 91-93).   Nevertheless, Dr. Fortner increased Plaintiff's Prednisone on two occasions, once on January 10, 2008 (although Dr. Fortner did not remember why), and once after that.   (Fortner depo. at 58-62, 73-76, Plaintiff's App'x. 27-28, 30-31; *see also* Clinic Visit Note at Deft's App'x. 40).   The increased dosages were tapered quickly again, so that for a day or two, the blood in Plaintiff's stools decreased, but then "went right back"; the frequency of his bowel movements did not decrease; his stool got blacker and tarrier; the blood clots were increasing; and Plaintiff felt worse.   (Smith depo. at 79-81, Plaintiff's App'x. 137).   During this time, Plaintiff also lost weight, had no appetite, and had to use the bathroom all day long.   (Smith depo. at 38, 56-57, 79-81, Plaintiff's App'x. 129, 131, 137).

Plaintiff testified that during this six-week timeframe, he repeatedly asked Nurse Martinez and others at the jail to let him see Dr. Fortner and a specialist, but his requests were refused.   (Smith depo. at 44-55, 98-101, Plaintiff's App'x. 130, 140; *see also* Dr. Fortner depo. at 78-80, Exh. 14 (note indicating that Plaintiff had asked to see Dr. Fortner on February 26, 2008, due to blood in his stool, and Dr. Fortner had told the reporting officer to have Plaintiff follow up with Nurse Martinez the next day)).   Plaintiff also averred that he had put in numerous written sick call requests at least twice a week, but later there would be no record of it.   (Smith depo. at 98-99, Plaintiff's App'x. 140).   Nurse Martinez testified that she had no knowledge that Plaintiff had requested to see Dr. Fortner and was not allowed to.   (Martinez depo. at 114, Plaintiff's App'x. 94).

Dr. Fortner next saw Plaintiff on February 14, 2008, at which point he noted that Plaintiff "looked sick and was acutely ill" due to his ulcerative colitis.   (Fortner depo. at 74, Plaintiff's

App'x. 31).  That same day, Dr. Fortner ordered that Plaintiff be sent to Dr. Secor, a

gastrointestinal specialist, but Nurse Martinez called the county indigent health care office and

learned that Dr. Secor was no longer in the area, so a new specialist needed to be located.

(Fortner depo. at 74-75, Plaintiff's App'x. 31; Martinez depo. at 102-04, Plaintiff's App'x. 91;

Deft's App'x. 42 ).  Dr. Fortner testified about the procedure for referring inmates to see a

specialist: "[i]f I referred them to a specialist, they were sent to a specialist . . . No one ever told

me not to."  (Fortner depo. at 10).  Sheriff Byrnes testified that if Dr. Fortner wanted an inmate

sent to a specialist, he could designate the specialist, and the county indigent health officer did

not have any authority to override that and, to his knowledge, did not have to locate a specialist

who would accept the county's reimbursement rate.  (Byrnes depo. at 17-18, Plaintiff's App'x.

68-69).

Plaintiff was taken to see a specialist, Dr. Staniunas, on February 26, 2008 – 12 days after

Dr. Fortner's order.  (Martinez depo. at 107-09, Plaintiff's App'x. 92).  During that 12-day

period, neither Dr. Fortner nor Nurse Martinez saw Plaintiff, but he was seen in his cell by others

because he got medication throughout the day.  (Fortner depo. at 77-78, 94-95, Plaintiff's App'x.

31-32, 35; Martinez depo. at 105-06, 111-13, Plaintiff's App'x. 91-93).  During this 12 days,

Nurse Martinez was discussing the situation with the county indigent health officer, which she

stated she was required to do, in order to find a specialist who would agree to treat a jail inmate.

(Martinez depo. at 40-41, 102-04, 116, Plaintiff's App'x. 78, 91, 94).  Once such a specialist was

located, Nurse Martinez contacted Captain Compton to handle transporting the detainee to the

specialist.  (Martinez depo. at 41, Plaintiff's App'x. 78).  Captain Compton testified that she was

responsible for arranging Plaintiff's transportation to the specialist, but she did not know why it

took 12 days to get Plaintiff to the specialist since she was just waiting for someone to tell her to arrange transport.  (Compton depo. at 30, App'x. 114).

When Plaintiff saw Dr. Staniunas, a colon and rectal specialist, the doctor ordered a colonoscopy and directed that Plaintiff be put on 60 milligrams of Prednisone per day.  Dr. Staniunas indicated that the test results of the colonoscopy might dictate that Plaintiff be hospitalized.  (*See* 2/26/08 Medical Record, Plaintiff's App'x. 150-51).  Plaintiff did not get a colonscopy until March 17, 2008, but Nurse Martinez was unsure of the cause of the 19-day delay.  (Martinez depo. at 119, Plaintiff's App'x. 95).  The colonoscopy indicated that Plaintiff had chronic active ulcerative colitis, and Dr. Staniunas recommended "aggressive inpatient treatment," since Plaintiff's condition had been unresponsive to maximum steroid treatment. (3/17/2008 Medical Record, Plaintiff's App'x. 152).

Neither Dr. Fortner, Nurse Martinez, nor Captain Compton monitored Plaintiff's health during the time from March 17 through March 19, 2008 (the date Plaintiff was transported to the hospital).  Nurse Martinez testified that the jail had no policies or procedures for monitoring acutely-ill inmates.  (Fortner depo. at 89, 94-95, Plaintiff's App'x. 33, 35; Martinez depo. at 56, 105-06, Plaintiff's App'x. 80, 91-92; Compton depo. at 31, 38, Plaintiff's App'x. 112, 114). Plaintiff's diagnosis upon admission to the hospital was acute exacerbation of chronic ulcerative colitis.  (Medical City Hospital record, Deft's App'x. 47).  The hospital doctors administered high doses of intravenous steroids and other medications, including Remicade.  (*Id.*; Fortner depo. at 110, Plaintiff's App'x. 38).  Plaintiff slowly improved during his three-week hospital stay from March 17, 2008 to April 11, 2008, but he was not "a hundred percent" at the time of his discharge.  (Medical City Hospital record, Deft's App'x. 47; Smith depo. at 85, Plaintiff's

App'x. 138).

Following Plaintiff's release back to the jail on April 11, neither Dr. Fortner nor Nurse

Martinez monitored his health status.  (Fortner depo. at 119-22, Plaintiff's App'x. 40-41;

Martinez depo. at 122-23, Plaintiff's App'x. 96).  Additionally, one of the medical treatments

ordered by Plaintiff's hospital doctors (a corticosteroid administered in a suppository form called

"Cortifoam") was never available to Plaintiff because the dispenser was defective, and the jail

did not obtain a replacement.  (Smith depo. at 86-87, 144-45, Plaintiff's App'x. 139, 146; Fortner

depo. at 123-26, Plaintiff's App'x. 41-42; Martinez depo. at 31-33, 130, 158, Plaintiff's App'x.

76, 98, 104).  Plaintiff also was supposed to be on a low-fiber, lactose free diet, but he testified

he never received such meals even though he repeatedly informed the guards about it, to which

they responded that he needed a doctor's order.  (Smith depo. at 62-64, 144, 146, 148, Plaintiff's

App'x. 133, 146-147; *see also* Fortner depo. at 121, Plaintiff's App'x. at 40 (acknowledging that

he did not know whether Plaintiff was ever put on physician-directed low fiber diet); Martinez

depo. at 157-58, Plaintiff's App'x. 103-04 (stating that she had spoken to the kitchen staff about

preparing low fiber meals)).  Plaintiff told Dr. Fortner during a sick call that the proper meals

were not being given to him, and Dr. Fortner said he was not aware of such orders and would

have Nurse Martinez verify that; nevertheless, Plaintiff still did not receive the proper diet.

(Smith depo. 146-49, Plaintiff's App'x. 147).

Dr. Fortner and Nurse Martinez were aware that the hospital doctors had ordered that

Plaintiff receive intravenous Remicade (a drug to treat flares), but the infusions would have to be

done outside the jail, and they did not know whether Plaintiff ever received them.  (Fortner depo.

at 112-13, 120, Plaintiff's App'x. 38, 40; Martinez depo. at 121-24, Plaintiff's App'x. 95-96).

Dr. Fortner also did not know whether Plaintiff had ever been taken for his follow-up appointment to the hospital physician, received any of his prescription or over-the-counter drugs, or had the ordered blood tests performed.  (Fortner Depo. at 113-16, 118-120, Plaintiff's App'x. at 38-40).

On April 13, 2008, Plaintiff's mother complained that Plaintiff was receiving insufficient food portions despite his doctors' orders.  (Saldeen complaint form, Plaintiff's App'x. 118). Captain Compton investigated by speaking to Nurse Martinez, who called one of Plaintiff's hospital doctors, and then informed Captain Compton that the doctor said Plaintiff did not need any additional food "other than the normal portions provided by the Kaufman County Sheriff's Office normal inmate meal plan."  (Compton depo. at 29, Plaintiff's App'x. 113; Letter from Captain Compton, Plaintiff's App'x. 119).

Plaintiff's condition began to worsen three to four days after he returned from the hospital.  (Smith depo. at 86, Plaintiff's App'x. 139).  Dr. Fortner saw Plaintiff on April 15, 2008, four days after his discharge, but did not determine the number of stools per day Plaintiff was having, ask whether Plaintiff had blood in his stools, or take his body temperature.  (Fortner depo. at 127-28, Plaintiff's App'x. 42).  Dr. Fortner next saw Plaintiff on May 8, 2008, because Plaintiff was complaining about having bloody stools, but he did not ask about the number of stools per day Plaintiff was having, ask whether Plaintiff had blood in his stools, or take his body temperature or pulse.  (Fortner depo. at 126-28, Plaintiff's App'x. 42; Smith depo. at 85, Plaintiff's App'x. 138).  A jail clinic visit note from May 8, 2008 indicates that the nurse was to call Plaintiff's gastroenterologist, and his Cortifoam was to be reordered.  (Deft's App'x. 48).  A follow-up note on that date indicates that Dr. Staniunas told Nurse Martinez that Plaintiff needed

to be scheduled for a colonoscopy and, depending on the results, might "go straight to the hospital for surgery." (Deft's App'x. 49). Nurse Martinez did not see Plaintiff during this time and did not know how he was progressing. (Martinez depo. at 127-28, Plaintiff's App'x. 97).

On May 12, 2008, Plaintiff saw Dr. Staniunas. (Deft's App'x. 50). By that time, Plaintiff's ulcerative colitis had worsened. (Smith depo. at 87-88, Plaintiff's App'x. 139; Doc. 10 at 33, Medical Record dated May 12, 2008, noting that Plaintiff had active left-sided colitis and that the "probable" treatment plan was a colectomy). Dr. Staniunas advised Plaintiff that, in light of the spread of the disease, the only alternative was the removal of his entire large intestine. (*Id*.; *see also* May 12, 2008 note from Dr. Staniunas that Plaintiff "has been refractory to medical therapy and wishes to proceed with colectomy" at Deft's App'x. 50; May 14, 2008 note from Dr. Staniunas that Plaintiff has been "refractory to maximal medical therapy" at Doc. 10 p. 43). On May 14, 2008, surgeons removed Plaintiff's large intestine, so that unformed feces could pass directly from his small intestine through a hole in his abdomen (stoma) into a bag that he must wear 24 hours a day. (Martinez depo. at 158-59, Plaintiff's App'x. 104; Fortner depo. at 129-31, 139-40, Plaintiff's App'x. 42-43; *see also* medical illustration, Plaintiff's App'x. 160).

On May 18, 2008, Plaintiff was discharged from the hospital and returned to the jail. (Martinez depo. at 34, Plaintiff's App'x. 77). The jail had no written plan in place that addressed care for seriously ill inmates or those who had just been released from the hospital, but jail staff passed by the cells hourly and would notify the medical department if an inmate was in distress. (Compton depo. at 20-21, 34-35, Plaintiff's App'x. 111, 115). Captain Compton arranged for Plaintiff to return to the jail after the evening meal had been served, so he was given a sack dinner that included corn chips. (Smith depo. at 59, Plaintiff's App'x. 132). The corn chips made

Plaintiff vomit and pulled all of the muscles and staples in his stomach such that he could not move or get out of bed for two to three days.  (Smith depo. at 64, 66-67, Plaintiff's App'x. 133-34).

Dr. Fortner saw Plaintiff on May 20 and May 22, 2008.  (Fortner depo. at 164-65, Plaintiff's App'x. 47).  On May 21, 2008, Plaintiff was discovered by a nurse lying on his side; he complained of abdominal pain and vomiting all night, and his cell had liquid feces all over it. (Smith depo. at 101, Plaintiff's App'x. 140; Martinez depo. at 145-48, Plaintiff's App'x. 100-01; Fortner depo. at 164-65, Plaintiff's App'x. 47; Clinic Visit Note, Plaintiff's App'x. 57).  Plaintiff testified that he believed Nurse Martinez was responsible for this because she oversaw the jail's medical staff.  (Smith depo. at 101, Plaintiff's App'x. 140).  He further averred that "Ms. Ramos" at the jail told him that she had informed Dr. Fortner about the situation and that, ultimately, she was the one who helped him. (Smith depo. at 190-91, Plaintiff's App'x. 148).  Nurse Martinez testified that at the time Plaintiff was discovered, 6:30 a.m., she was not at work because her shift started at 8:00 a.m.  (Martinez depo. at 147-48, Deft's App'x. 119-20).

The next day, May 22, 2008, Nurse Martinez refused to let Plaintiff use a wheelchair to attend the psychological counseling she said he needed, telling him he had to walk, but he said he could not.  (Martinez depo. at 134-36, Plaintiff's App'x. 99; Smith depo. 101-02, Plaintiff's App'x. 140-41).  On August 4, 2008, Plaintiff was discharged from the jail and moved to the Texas Department of Corrections.  (Fortner depo. at 133, Plaintiff's App'x. 43; Martinez depo. at 34-37, Plaintiff's App'x. 77).  Nurse Martinez wrote "yes, yes, yes" on his chart when he was discharged from the jail and explained during her deposition that she "was glad he was going" because his care required so much time and "glad he was doing well and moving on."  (Martinez

depo. at 34-37, Plaintiff's App'x. 77).

Sheriff Byrnes testified during his deposition that the jail had a written policy that set out how the jail would deliver medical services, and Dr. Fortner was in charge of providing medical services to inmates and deciding whether to refer an inmate to a specialist.  (Byrnes depo. at 5-6, 11-12, Plaintiff's App'x. 65-67).  Sheriff Byrnes testified that he did not know who Plaintiff was and had no personal contact with him during his incarceration.  (Byrnes depo. at 7, Plaintiff's App'x. 66).  Further, he stated, any inmate who wanted to see Dr. Fortner was allowed to if the inmate asked.  (Byrnes depo. at 14, Plaintiff's App'x. 68).

Sheriff Byrnes stated that he had some knowledge of Plaintiff's health status because he had received a letter from Plaintiff's mother and from Senator Kay Bailey Hutchison, and he referred those to Captain Compton who investigated and determined that Plaintiff was being cared for.  (Byrnes depo. at 19, Plaintiff's App'x. 69).  Additionally, Sheriff Byrnes was aware that Plaintiff had to be hospitalized for abdominal surgery, as it presented a staffing problem since guards had to go with him.  He did not have any plan in place to monitor Plaintiff upon his discharge from the hospital, and he assumed Dr. Fortner was responsible for that.  (Byrnes depo. at 25-26, Plaintiff's App'x. 70-71).  Sheriff Byrnes stated in discovery that he was never contacted by Plaintiff's attorney about Plaintiff's medical condition and had only general knowledge that Plaintiff had to have surgery at the time of the procedure.  (Deft's App'x. 81). Plaintiff testified that he was unsure who his attorney had contacted at the jail regarding his need for medical care, the form of the communication, the date of such contact, or exactly what was communicated.  (Smith depo. at 45-49, Deft's App'x. 9-10).

The jail's policy manual provides that routine medical services are available to inmates

13

twice a week, at sick calls, by the jail's contract physician. (Kaufman County Sheriff's Dep't Jail and Communications Rules and Procedures, Plaintiff's App'x. 156). For non-acute issues, the inmate must fill out a form and return it to a floor jailer or medication officer; a different procedure governs when an inmate has a medical emergency. (*Id.*). The manual does not contain a section governing the treatment of chronically-ill patients or the care of patients who recently have been hospitalized.

Dr. Robert M. Jacobson submitted a Declaration on behalf of Plaintiff in which he averred that he is a board certified colon and rectal surgeon and had reviewed Plaintiff's medical records as well as the depositions of Dr. Fortner and Nurse Martinez. (Jacobson Dec., Plaintiff's App'x. 1). Dr. Jacobson concluded that Plaintiff's medical treatment during his January 2008 flare was "definitely inadequate and too late to prevent severe toxic symptoms." (*Id.*). Dr. Jacobson determined that Plaintiff's toxic symptoms were present on January 2, 2008, as evidenced by Plaintiff's high heart rate, "which by itself is an ominous sign of toxicity and increasing exacerbation of his colitis." (*Id.*). Further, Dr. Jacobson stated, Plaintiff's conditions and symptoms presented an obvious risk of harm, which was not properly treated, and the treatment he received on January 2, 2008 was "inadequate and too short to be effective." (*Id.*).

Dr. Jacobson opined that, based on the obviousness of the risk on January 2, 2008, Plaintiff either "should have been immediately referred to a specialist or the known and accepted dose of Prednisone in the 40 to 60 milligrams range should have been prescribed," with tapering of the dosage occurring over a period of weeks, not days. (*Id.*). Additionally, Dr. Jacobson averred, Plaintiff should have been seen within a few days after January 2, 2008 to see if the treatment was working, and the six-week delay during which his condition further deteriorated

14

"falls plainly below the standard of competence for treating a flare of ulcerative colitis in a patient with a history of previous flares." (*Id.*).  Dr. Jacobson also believed that the delays, failure to treat, and failure to timely refer Plaintiff to a specialist or the hospital constituted even less adequate treatment, "plainly fell below the standard of care for medical treatment," and "resulted in failure to control the disease." (*Id.*).  Dr. Jacobson concluded that the failure to provide Plaintiff with proper medical treatment "caused [Plaintiff] to end up with surgery and permanent loss of his colon." (*Id.*).

Plaintiff also provided an article from the American Academy of Family Physicians; Dr. Fortner testified he had relied on the article in treating Plaintiff because he considered it a reliable authority.  (Fortner depo. at 30-32, 62-66, Plaintiff's App'x. 20, 28-29; Fortner response to Interrogatory 1, Plaintiff's App'x. 13; *Ulcerative Colitis: Diagnosis and Treatment*, AMERICAN ACADEMY OF FAMILY PHYSICIANS (2007) at Plaintiff's App'x. 4-11). The article states that a colonoscopy is one of the tests of choice in diagnosing ulcerative colitis, and patients who fail to respond to topical treatment should be administered the full dose therapy of 40 to 60 milligrams of Prednisone for 10 to 14 days, with the dosage being tapered gradually by five milligrams per week.  (Plaintiff's App'x. 6-8).  Other important diagnostic tools noted in the article are (1) checking stool samples, (2) conducting a complete blood count, (3) checking temperature, with a fever above 100 degrees indicating a severe flare, (4) checking pulse, with a pulse above 100 indicating a severe flare, and (5) inquiring about the number of bowel movements per day, with more than six per day indicating a severe flare.  (Plaintiff's App'x. 6). Further, the article provides, colectomy (excision of a segment or all of the colon) is warranted in patients who have disease resistant to maximal medical therapy.  (Plaintiff's App'x. 9).

## II. APPLICABLE LAW

**A.     Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotes omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**B.     Section 1983 and Qualified Immunity**

Title 42 U.S.C. § 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).  To state a claim under section 1983, a plaintiff must allege facts that show that (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) the defendants were acting

under color of state law.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).  The

constitutional right of a pretrial detainee to medical care flows from both the procedural and

substantive due process guarantees of the Fourteenth Amendment.  *Hare v. City of Corinth,*

*Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (*en banc*).  A pretrial detainee has a clearly established

constitutional right not to be denied, by deliberate indifference, attention to his serious medical

needs.  *Id.* at 650.

          "The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (citation omitted).  The qualified immunity inquiry involves two prongs that the

Court must answer affirmatively before an official is subject to liability: (1) whether the

defendant's conduct violated a constitutional right, and (2) whether the defendant's conduct was

objectively unreasonable in light of clearly established law at the time of the violation.  *Id.* at

232.  A court may begin its assessment with either prong.  *Id.* at 236 (*overruling in part Saucier*

*v. Katz*, 533 U.S. 194 (2001)).  A qualified immunity defense alters the usual summary judgment

burden of proof.  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010), *cert. denied*, 131 S.Ct.

2932 (2011).  Once an official asserts a qualified immunity defense, the burden shifts to the

plaintiff to rebut the defense by establishing a material fact issue as to whether the official's

allegedly wrongful conduct violated clearly established law.  *Id.*  The plaintiff bears the burden of

negating qualified immunity, but all inferences are drawn in his favor.  *Id.*

**C.      Standards Applicable to Constitutional Challenges by Pretrial Detainees**

          Determining which legal standard to apply in analyzing constitutional challenges by

pretrial detainees depends on whether the detainee is challenging a "condition of confinement" or an "episodic act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (*en banc*). A "condition of confinement" case is a constitutional attack on "general conditions, practices, rules, or restrictions of pretrial confinement." *Shepherd v. Dallas County*, 591 F.3d 445, 454 (5th Cir. 2009) (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)). A jail condition is often the manifestation of an explicit policy or restriction, such as the number of bunks per cell, mail privileges, and the like. *See Scott*, 114 F.3d at 53 n.2 (listing cases deemed to state challenges to conditions of confinement). However, a case involving particular acts or omissions by jail officials can implicate conditions of confinement as well, if the acts or omissions implement a rule or otherwise demonstrate the existence of an intended condition or policy. *Hare*, 74 F.3d at 645. A detainee also may make out a conditions of confinement case based on particular acts or omissions if he demonstrates the existence of a *de facto* policy, i.e. the pattern of acts or omissions is sufficiently pervasive to prove an intended condition or practice. *Shepherd*, 591 F.3d at 452.

For example, in *Shepherd*, the Fifth Circuit Court of Appeals held that the pretrial detainee's claim implicated conditions of confinement because the plaintiff did not complain about the specific acts or omissions of individual jail employees, but rather about the jail's method of providing medical care to chronically ill inmates. *Shepherd*, 591 F.3d at 453. There, the pretrial detainee alleged that the jail's monitoring and treatment of chronically ill detainees was grossly inadequate due to poor or non-existent procedures, which led to him suffering a stroke when his medication was not properly administered by jail employees, including a doctor and nurses. *Id.* at 449-50, 453 (noting that the detainee was administered medication only

intermittently and, just before his stroke, was not monitored or given any medical treatment for seven weeks).  The court noted that the plaintiff had presented evidence that there were no policies or procedures to manage detainees' chronic illnesses, and inmates were seen only when their conditions deteriorated to an urgent status.  *Id.* at 451, 456 (upholding jury verdict in detainee's favor on plain error review).

If a case is properly classified as a "condition of confinement" case, then the "reasonable relationship" test set forth in *Bell* applies.  Under this test, if a particular condition is not reasonably related to a legitimate, non-punitive governmental objective, a court may infer that the purpose of the action is to unconstitutionally punish pretrial detainees.  *Bell*, 441 U.S. at 539.  In short, to prevail on a conditions of confinement claim, Plaintiff must prove "(1) a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [his] constitutional rights."  *Duvall v. Dallas County, Tex.*, 631 F.3d 203, 207 (5th Cir.) (alterations in original), *cert. denied*, 132 S.Ct. 111 (2011).

On the other hand, where the complained-of harm is a particular act or omission of one or more officials, the case is properly characterized as an "episodic act or omission" case.  *Brown v. Strain*, Case No. 11-30082, manuscript op. at 6 (Nov. 18, 2011) (holding that parish deputy's refusal to get emergency medical care for arrestee he was transporting to jail constituted an episodic act or omission).  In an "episodic act or omission" case, a detainee's claim faults specific jail officials for their acts or omissions, and the plaintiff cannot establish the existence of an officially sanctioned unlawful condition.  In such a case, "an actor usually is interposed

between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott*, 114 F.3d at 53.

In *Scott*, although the plaintiff detainee complained generally that the jail had inadequate staffing, the actual harm she suffered was the sexual assaults committed by a lone guard during one eight-hour shift. The Fifth Circuit characterized this as an episodic event perpetrated by an actor interposed between the detainee and the city, but allegedly permitted by the general condition of understaffing. *Id.* The court noted that the condition of understaffing did not itself constitute the harm – it merely led to opportunity for the harm, i.e., the sexual assaults, to occur on one occasion. *Id.* The court thus concluded that the detainee's case involved episodic acts by a prison employee. *Id.* at 54. In an "episodic act or omission" case involving a pretrial detainee, a "deliberate indifference" standard applies. *Hare*, 74 F.3d at 646-47.

### III. ARGUMENTS AND ANALYSIS

Defendants Nurse Martinez, Captain Compton, and Sheriff Byrnes now move for summary judgment, asserting the defense of qualified immunity. (Doc. 46 at 1). Dr. Fortner has separately filed for summary judgment and also asserts qualified immunity. (Doc. 61 at 16).

A.    **Threshold Issues**

As an initial matter, there is some dispute among the parties as to whether Plaintiff is alleging a "conditions of confinement" case or an "episodic acts or omissions" case. Plaintiff urges the Court to apply the "conditions of confinement" legal standard to his policy-based challenges and apply that same standard to his "episodic" claims of mistreatment, but argues that he can survive summary judgment under either theory. (Doc. 59 at 28-30). Defendants maintain

20

that this is an "episodic acts or omissions" case, and they are entitled to summary judgment because Plaintiff cannot demonstrate the requisite deliberate indifference. (Doc. 63 at 8-10; Doc. 68 at 16). For the reasons set forth below, the Court determines that Plaintiff's claims against Sheriff Byrnes allege unconstitutional conditions of confinement, while his claims against the remaining Defendants are based on particular episodes or omissions. Thus, two different standards will apply to Plaintiff's allegations.

Plaintiff also urges as a preliminary matter that the Court should strike Defendants' (1) references to his criminal charges because they are irrelevant and prejudicial and (2) statements that Plaintiff's colectomy was elective because that is not supported by the record. (Doc. 59 at 22-23). The Court declines to strike these statements from the record. Nevertheless, the undersigned did not consider Plaintiff's criminal charges in rendering a recommendation in this case, and finds that Plaintiff has presented an abundance of evidence to dispute Defendants' statements that his colectomy was elective as set forth in greater detail below.

## B.     Sheriff Byrnes

Sheriff Byrnes points out that Plaintiff testified that Sheriff Byrnes had no involvement in the provision of medical treatment to inmates, and Plaintiff never had any personal contact with Byrnes. (Doc. 46 at 10). He argues that Plaintiff was unable to say with certainty if or when his defense attorney wrote directly to Sheriff Byrnes about Plaintiff's medical condition, and Sheriff Byrnes swore under oath that he was never contacted. (*Id.*). Thus, Sheriff Byrnes contends, Plaintiff cannot show that he was aware of the events surrounding Plaintiff's care such as to demonstrate that he would have been aware of a substantial risk of harm to Plaintiff. (*Id.*).

Plaintiff responds that Sheriff Byrnes is liable in his official capacity because the jail had

21

policies of (1) not monitoring the health status of seriously ill inmates such as himself, (2) delaying transportation of a seriously ill inmate to an outside specialist while Nurse Martinez went back and forth with the county indigent health officer to find a doctor who would accept the county's low rate of payment for medical services, (3) waiting until a seriously ill inmate filled out a form requesting treatment and failing to have any policy or practice to review the requests, (4) not ensuring adequate time by a medical doctor to review inmates' symptoms to arrive at a correct diagnosis, and (5) allowing seriously ill inmates to return from hospitalization without any plan to care for or monitor them. (*Id.* at 32-33). Finally, Plaintiff notes that Sheriff Byrnes was aware of Plaintiff's condition at some point because he received a complaint about his care from Plaintiff's mother, but he just referred the complaint to Captain Compton. (*Id.* at 33).

In reply, Sheriff Byrnes contends that Plaintiff did not sue him in his official capacity, and there is no evidence of any of the five "policies" Plaintiff describes. (Doc. 63 at 2-3). Further, Sheriff Byrnes claims he did not have policymaking authority in the realm of inmate medical care and did not make or review medical decisions. (*Id.* at 7-8).

Plaintiff objects to Sheriff Byrnes's argument that he was not sued in his official capacity, pointing out that Sheriff Byrnes admitted in his Answer that he was acting in his official capacity and was entitled to qualified immunity. (Doc. 67 at 1). Moreover, he argues that while he did not specify in his complaint in which capacity he was suing Sheriff Byrnes, he did state in response to an earlier motion to quash that Sheriff Byrnes was subject to liability in his official capacity, and Sheriff Byrnes did not object to that characterization or to the Court's order noting Sheriff Byrnes's potential liability as a county official. (*Id.* at 2).

### 1. *Official Capacity versus Individual Capacity*

The Court finds that Sheriff Byrnes's argument that Plaintiff did not sue him in his official capacity is specious. Plaintiff did not specify in his complaint whether he was suing Sheriff Byrnes in his individual or official capacity. However, liberally construing his initial *pro se* pleadings, the Court concludes that the suit was intended to be against Sheriff Byrnes in his official capacity. *See* Doc. 1 at 3 (noting that the basis of liability against Sheriff Byrnes was that he was "responsible for all inmates in his custody"); Doc. 2 at 4 (memorandum in support of complaint, noting that Sheriff Byrnes instituted a policy of systematically denying detainees access to medical care); Doc. 14 at 2 (response to magistrate judge's questionnaire, stating that Sheriff Byrnes is liable because, *inter alia*, he was responsible for failing to provide an effective medical policy for the jail). Moreover, Sheriff Byrnes noted in his Answer that he was sued in his official capacity. (Doc. 29 at 2). Accordingly, because Sheriff Byrnes has been sued in his official capacity, a qualified immunity defense is not available to him. *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

### 2. *Official Capacity Liability*

Plaintiff's policy-based claims against Sheriff Byrnes stem from his allegations that the jail's conditions of confinement were unconstitutional insofar as the jail lacked an adequate policy governing the treatment of chronically ill and recently hospitalized patients and had customs or unofficial policies in place that prevented Plaintiff's timely treatment. *Shepherd*, 591 F.3d at 453; *see also Loftis v. Dallas County*, 2011 WL 4090965 at *4 (N.D. Tex. 2011) (detainee's cause of action was for unconstitutional conditions of confinement, rather than episodic acts, where detainee claimed he was deprived of adequate blood pressure medication

because the jail was understaffed and did not adequately monitor chronically ill inmates' health), *adopted by* 2011 WL 4090962 (N.D. Tex. 2011) (Boyle, J.); *Palo v. Dallas County*, 2007 WL 2140590, *4 (N.D.Tex. 2007) (Fitzwater, C.J.) (finding that conditions of confinement analysis applied where, although a portion of the detainee's complaint focused on the acts or omissions of specified nurses and jail officers, the complaint also attacked the jail medical care system itself and alleged that "the inadequate system of medical care caused him to suffer a deprivation of his constitutional rights"). Thus, Plaintiff's claims against Sheriff Byrnes implicate the conditions of his confinement.

In this circuit, a suit against a sheriff in his official capacity is, in essence, a claim against the county. *Brown*, Case No. 11-30082, manuscript op. at 9. A county does not incur section 1983 liability for injuries caused solely by its employees and cannot be held liable under section 1983 on a *respondeat superior* theory. *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 691, 694 (1978). Rather, to impose section 1983 liability on a county, the plaintiff must show that there was either an official policy or an unofficial custom, adopted by the county, that was the moving force behind the claimed constitutional violation. *Duvall*, 631 F.3d at 209. Nevertheless, a plaintiff need not make a deliberate indifference showing under *Monell* in a "conditions of confinement" case. *Id.* at 209 n.19 (citing *Shepherd*, 591 F.3d 445).

A "policy or custom" is either (1) a policy statement or rule that is officially promulgated by the county's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of county officials or employees, which is so common and well settled as to constitute a custom that fairly represents county policy. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*). Actual or

24

constructive knowledge of the custom must be attributable to the county's governing body or to the official to whom policy-making authority has been delegated. *Id.*

A jail condition is often the manifestation of an explicit policy or restriction, such as the number of bunks per cell, mail privileges, and the like. *See Scott*, 114 F.3d at 53 n.2 (listing cases deemed to state challenges to conditions of confinement). In some cases, however, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions by jail officials that is sufficiently extensive or pervasive to prove an intended condition or practice. *Hare*, 74 F.3d at 645. In this case, Plaintiff alleges that the jail's customs, rather than official rules, led to the constitutional violations he suffered. Thus, the Court must determine whether such customs existed and, if they did, whether they were sufficiently extensive so as to fairly represent county policy.[4] *Bennett*, 735 F.2d at 862.

Plaintiff has not presented sufficient evidence to demonstrate that the jail had a custom of delaying transportation of seriously ill inmates to an outside specialist due to the difficulty in finding a doctor who would accept low reimbursement for medical care. Rather, Nurse Martinez testified that the lag in Plaintiff's case was caused by the requirement that she consult with the county indigent health officer to find a doctor who would treat an inmate. (Martinez depo. at 40-41, 102-04, 116, Plaintiff's App'x. 78, 91, 94) (testifying that she was required to consult with the county indigent health officer to find a specialist who would agree to treat a jail inmate and

---

[4] Defendant Byrnes argues at length that he cannot be held liable because he is not the jail's policymaker in the area of health care. (Doc. 63 at 7-8). However, the Court need not reach this question because the undersigned finds that there existed a sufficiently pervasive unconstitutional policy at the jail as set forth *infra. Cf. Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548 (5th Cir. 2008) (noting that a "single decision" by a policymaker may constitute an official policy, but only under the "extremely narrow" circumstance that the decisionmaker was also a "final policymaker.").

she did not know anything about the county's reimbursement policy).  Plaintiff also has not cited to any evidence showing that the county had a custom or policy of not ensuring adequate time by a medical doctor to review inmates' symptoms to arrive at a correct diagnosis.  *See* Doc. 59 at 32.

Nevertheless, Plaintiff has presented sufficient evidence to support his contentions that the jail had no policy in place to (1) monitor the health status of seriously ill inmates, (Martinez depo. at 56, 105-06, 119, Plaintiff's App'x. 80, 91-92, 95 (testifying that jail had no policies or procedures for monitoring acutely ill inmates); or (2) care for inmates recovering from a serious illness after hospitalization, (Martinez depo. at 151, Plaintiff's App'x. 102; Compton depo. at 20-21, 34-35, Plaintiff's App'x. 111, 115) (acknowledging that upon Plaintiff's return to the jail following his colectomy, Dr. Fortner, Captain Compton, and Nurse Martinez had no written plan to receive him back at the jail or monitor his condition); (Byrnes depo. at 25-26, Plaintiff's App'x. 70-71) (averring that he did not have any plan in place to monitor Plaintiff upon his discharge from the hospital, and he assumed Dr. Fortner was responsible for that).  *Shepherd*, 591 F.3d 450-51, 456 (upholding jury verdict in detainee's favor where detainee submitted evidence that he was administered medication only intermittently and, just before his stroke, was not monitored or given any medical treatment for seven weeks).

Further, Plaintiff has presented evidence that the jail had a policy of delaying treatment until a seriously ill detainee filled out a form requesting treatment, but failed to have any policy or practice to review the requests to ensure they were being implemented, (Smith depo. at 98-99, Plaintiff's App'x. 140) (averring that he had put in written sick call requests at least twice a week, but later there would be no record of it); (Fortner depo. at 76-77, Plaintiff's App'x. 31) (testifying that he was not aware that Plaintiff's requests to see him had been rejected).  *See, e.g.*,

*Shepherd*, 591 F.3d at 451, 456 (upholding jury verdict in detainee's favor where he presented evidence about the lack of timely review of sick call requests by nurses).  Although Sheriff Byrnes disputes the existence of these "policies" by pointing to the jail policy manual that notes the availability of emergency health care 24 hours a day and a 14-point plan for addressing emergency medical situations, Plaintiff has provided sufficient evidence to create a genuine issue of material fact as to the jail's policies or lack thereof in regard to chronically ill and recently hospitalized detainees.  (Doc. 47, Deft's App'x. 110-11).  *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 248.

Moreover, these policies were applied repeatedly to Plaintiff during the five-month course of his ulcerative colitis flare and thus evidence a pattern of acts or omissions by jail officials that is sufficiently extensive so as to prove an intended condition or practice.  *Hare*, 74 F.3d at 645. Indeed, as detailed above, Defendants themselves acknowledged that there were no fixed policies in place to care for any seriously ill or recently hospitalized detainee.

Furthermore, actual or constructive knowledge of these policies is attributable to Sheriff Byrnes, the person with policy-making authority at the jail.  *Bennett*, 735 F.2d at 862.  A sheriff is the county's final policymaker in the area of law enforcement and running the county jails. *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (noting that an elected county official, such as the sheriff, holds "virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein); Tex. Local Gov't. Code § 351.041(a) ("[t]he sheriff of each county is the keeper of the county jail. The sheriff shall safely keep all prisoners committed to the jail by lawful authority, subject to an order of the proper court."); Tex. Local Gov't Code

§ 351.041(b) ("[t]he sheriff may appoint a jailer to operate the jail and meet the needs of the prisoners, but the sheriff shall continue to exercise supervision and control over the jail.").

Actual knowledge of deficiencies with the jail's health care customs and policies may by shown by such means as receipt of written information. *See Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (*en banc*).  In this case, Sheriff Byrnes testified regarding the jail's policies governing the delivery of medical services and stated that Dr. Fortner was in charge of referring an inmate to a specialist.  (Byrnes depo. at 5-6, 11-12, Plaintiff's App'x. 65-67).  Sheriff Byrnes also testified that he had some knowledge of Plaintiff's health status because he had received letters from Plaintiff's mother and Senator Hutchison about Plaintiff, which he referred to Captain Compton for investigation.  (Byrnes depo. at 19, Plaintiff's App'x. 69).  Additionally, Sheriff Byrnes knew when Plaintiff was hospitalized for abdominal surgery, and he had no plan in place to monitor Plaintiff upon his discharge from the hospital because he assumed that was Dr. Fortner's responsibility.  (Byrnes depo. at 25-26, Plaintiff's App'x. 70-71).

Plaintiff has presented sufficient evidence to show that Sheriff Byrnes had actual knowledge of the alleged problems with the jail's medical policies.  First, he testified that he had received letters about Plaintiff's treatment.  *Bennett*, 728 F.2d at 768.  Although the exact content of the communications Sheriff Byrnes received is not clear from the record, it is reasonable to assume that the letters alerted Byrnes to the problems that Plaintiff was having obtaining adequate medical care.  *Little v. Liquid Air Corp.*, 37 F .3d 1069, 1075 (5th Cir. 1994) (providing that all reasonable inferences are drawn in favor of the nonmoving party in a summary judgment determination).  Further, Sheriff Byrnes acknowledged that he was familiar with the jail's medical policy manual and knew there was no plan to accommodate inmates returning to the jail

28

after being hospitalized.

The final showing required by *Monell* is a determination of whether the policies at issue were the "moving force" behind a constitutional violation. *Duvall*, 631 F.3d at 209. In other words, in addition to culpability, Plaintiff must show a direct causal link between the jail's policies and a constitutional deprivation. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). In this case, there can be no serious question that, but for the jail's policies or lack thereof relating to its treatment of chronically ill and recently hospitalized patients, Plaintiff would not have suffered the injuries he did. *See* Jacobson Dec., Plaintiff's App'x. 1 (averring that the failure to provide Plaintiff with proper medical treatment "caused [Plaintiff] to end up with surgery and permanent loss of his colon.").

However, Plaintiff still must demonstrate that the jail's policies were unconstitutional. *Piotrowski*, 237 F.3d at 579. Without question, the right to receive adequate medical care during pretrial confinement is well established. *Brown*, Case No. 11-30082, manuscript op. at 5. To make a showing of unconstitutional medical care in a "conditions of confinement case," the Court asks whether the particular condition is reasonably related to a legitimate governmental objective. *Bell*, 441 U.S. at 539. Considering the parties' testimony, Dr. Jacobson's declaration, and the medical records, the Court concludes that Plaintiff has adduced sufficient evidence to enable a reasonable jury to find that while he was detained at the jail, he was deprived of constitutionally adequate medical care. Specifically, a reasonable jury could find that the medical plan at the jail suffered from various deficiencies, including inadequate follow-up care, medication administration, and monitoring. *See Palo*, 2007 WL 2140590 at *10 (denying summary judgment where jail lacked adequate intake screening, follow-up care, medication

administration, and staffing).  The jury also could reasonably find that Plaintiff was subjected to these inadequate medical conditions.  *Id.*  Sheriff Byrnes does not argue that the inadequate medical conditions of which Plaintiff complains were reasonably related to a legitimate government purpose.  Therefore, a reasonable jury could find, under the *Bell* standard, that the conditions to which Plaintiff was subjected were not reasonably related to a legitimate government interest and thus "punished" Plaintiff in violation of his Fourteenth Amendment rights.  *Id.* (denying summary judgment where county did not argue that jail's inadequate medical care was reasonably related to a legitimate government purpose).  Accordingly, Plaintiff has presented sufficient evidence to withstand Sheriff Byrnes's motion for summary judgment.

### C.    Plaintiff Asserts Episodic Acts or Omissions as to the Remaining Defendants[5]

Plaintiff's claims as to Captain Compton, Nurse Martinez, and Dr. Fortner allege episodic acts because Plaintiff complains of their particular acts or omissions and then points derivatively to a county policy (or lack thereof) that permitted or caused the acts or omissions.  *Brown*, Case No. 11-30082, manuscript op. at 6 (citing *Scott*, 114 F.3d at 53).  Accordingly, Plaintiff's claims as to these Defendants involve application of the "deliberate indifference" standard.  *Hare*, 74 F.3d at 646-47.  Moreover, these policies were applied repeatedly to Plaintiff during the five-month course of his ulcerative colitis flare and thus evidence a pattern of acts or omissions by jail officials that is sufficiently extensive so as to prove an intended condition or practice.  *Hare*, 74 F.3d at 645.

Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary

---

[5]  While Plaintiff's claims against Compton, Martinez, and Fortner involve episodic acts or omissions, the outcome would be the same even if the Court applied the conditions of confinement standard.

and wanton infliction of pain," proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This is true whether the indifference is manifested by prison doctors in response to an inmate's medical needs or by prison officials in intentionally denying or delaying access to medical treatment. *Id.* at 104-05. A cause of action for deliberate indifference to an inmate's medical needs can be maintained if there is a delay in access to medical care that results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Deliberate indifference also can be shown by proving that jail officials refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly show that they had a wanton disregard for the detainee's serious medical needs. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Under the "deliberate indifference" standard, Plaintiff thus must establish that Defendants Martinez, Compton, and Fortner acted with subjective deliberate indifference to his need for medical care. *Brown*, Case No. 11-30082, manuscript op. at 6. To show that level of indifference, Plaintiff must present evidence that: (1) those Defendants had "subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn"; (2) the Defendants actually drew that inference; and (3) the Defendants' response to the risk indicates that they subjectively intended that the harm occur. *Id.* (quotation marks omitted). A prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842-43 (1994).

> 1.   *Captain Compton*

Captain Compton argues that she is entitled to summary judgment because her only involvement in the case was when she investigated two of Plaintiff's mother's complaints. The

first complaint was that Plaintiff's medication was being withheld in November 2007, yet

Plaintiff testified that the withholding of his medication did not cause him problems at that time.

(Doc. 46 at 11-12; *see also* Smith depo. at 71, Deft's App'x. 12 (Plaintiff acknowledging that he

did not have any problems during the two-week period when his Sulfasalazine was taken away).

The second complaint was in April 2008 when Plaintiff's mother complained about his food

portions, and Captain Compton consulted with Nurse Martinez in refuting the complaint.  (*Id.* at

12).

Plaintiff responds that Captain Compton conducted an inadequate investigation into the

complaint about the withholding of Plaintiff's medication in that she merely spoke informally to

Nurse Martinez.  (Doc. 59 at 37).  Plaintiff speculates that if Captain Compton had investigated

more thoroughly, she would have determined that Plaintiff should have been monitored and that

withholding his medication might have an adverse effect which could have caused his Christmas

2007 flare.  (*Id.*).  As to Plaintiff's mother's April 2008 complaint about his food portions,

Plaintiff urges that Captain Compton's investigation was similarly insufficient because if she had

investigated further, she would have learned that (1) the jail had not provided Plaintiff a

Cortifoam packet that had been prescribed by the hospital doctors and (2) Plaintiff was not

receiving the low fiber, lactose free diet that had been ordered by his outside doctors.  (*Id.* at 38).

Plaintiff further contends that Captain Compton was responsible for arranging his

transportation to a specialist, but she did not know why it took so long to get Plaintiff to Dr.

Staniunas or to a clinic for a colonoscopy.  (*Id.*).  Finally, Plaintiff maintains that Captain

Compton was responsible for enforcing the jail's policies regarding medical treatment of inmates

and thus was involved in failing to monitor seriously ill inmates and other policies that caused

delay in getting inmates to outside specialists.  (*Id.* at 38-39).

Upon review, Plaintiff's summary judgment evidence does not show that Captain Compton was aware of his need for medical attention and ignored that need, or that any delay in medical treatment was attributable to Captain Compton.  *See Easter*, 467 F.3d at 463.  Captain Compton's involvement in the case is based on two very limited interactions concerning Plaintiff.  In particular, she investigated and responded to two written complaints from Plaintiff's mother.  (Compton depo. at 23-25, Plaintiff's App'x. 112; Letter from Captain Compton, Plaintiff's App'x. 117, 119).  Plaintiff's theory that, had Captain Compton investigated the complaints more thoroughly, she would have determined that Plaintiff had medical problems and difficulty receiving the proper medication and diet is mere speculation.  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir. 1991) (summary judgment is appropriate where non-movant's arguments rest upon "conclusory allegations, improbable inferences, and unsupported speculation") (quotation omitted).  Further, while Captain Compton was responsible for arranging Plaintiff's transportation to Dr. Staniunas, she testified (and Plaintiff has presented no competent contrary evidence) that she did not know why it took so long to get Plaintiff to the specialist since she was merely waiting for someone to tell her to arrange transport.  (Compton depo. at 30, Plaintiff's App'x. 114).

Finally, Plaintiff's argument that Captain Compton should be held liable under section 1983 because she was responsible for enforcing the jail's policies regarding medical treatment of inmates also fails because there is no evidence to suggest that Captain Compton actively participated in any of the constitutional violations alleged in this case or that she implemented unconstitutional policies that resulted in the violations.  *Gates v. Texas Dep't of Prot. & Reg.*

33

*Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) (noting that a supervisory official may be held liable under section 1983 for constitutional violations committed by subordinates only if she: (1) affirmatively participated in acts that caused the constitutional deprivation, or (2) implemented unconstitutional policies that causally resulted in constitutional injury).

Based on these facts, Plaintiff has not shown that Captain Compton was subjectively aware of the risk of serious harm to him and that she disregarded that risk. *Brown*, Case No. 11-30082, manuscript op. at 6. There is no evidence in the record to suggest that Captain Compton drew the inference that a substantial risk of serious harm existed as to Plaintiff and, given her limited interactions with Plaintiff, the Court cannot find that the substantial risk of harm to Plaintiff was so obvious as to allow an inference to be drawn that Plaintiff was at risk. *Farmer*, 511 U.S. at 842-43. Accordingly, Captain Compton is entitled to summary judgment.

> 2.    *Nurse Martinez*

Nurse Martinez argues that she was not involved in the actions Plaintiff contends were improper, such as prescribing an inadequate amount of Prednisone, because she did not have authority to write prescriptions. (Doc. 46 at 13-14). Further, Plaintiff's Sulfasalazine was taken away in November 2007 by Nurse Martinez at Dr. Fortner's direction because Plaintiff was hoarding pills. (*Id.* at 14). Finally, Nurse Martinez contends that she was not at the jail when Plaintiff was found lying in his own feces. (*Id.* at 14-15).

Plaintiff responds that Nurse Martinez was involved in the decision to confiscate his Sulfasalazine even though she knew it was necessary to keep his disease in remission, and she did not check to see the effect seizing his medication might have on his health. (Doc. 46 at 34-35). Further, he contends, a jury should decide whether there was a causal link between the

34

seizure of his medication and his severe flare of colitis the following month.  (*Id.* at 35).  Next, Plaintiff argues that, in January and February 2008, Nurse Martinez did not monitor his health even though she knew he was seriously ill and had been prescribed Prednisone, which is known to have serious side effects, nor did she schedule Plaintiff for an appointment with Dr. Fortner despite his deteriorating condition and repeated requests to see a doctor.  (*Id.*).

Plaintiff also contends that Nurse Martinez was responsible for the scheduling delays in his (1) seeing Dr. Staniunas, which took 12 days, and (2) getting a colonoscopy, which took 19 or 20 days.  (*Id.* at 35-36).  Additionally, Plaintiff urges, after he returned from his first hospitalization, Nurse Martinez failed to monitor his health status and provide him with a working Cortifoam packet to keep his ulcerative colitis in remission.  Finally, Plaintiff states, Nurse Martinez (1) did not monitor his condition post-surgery, which led to him lying in his own feces, and (2) would not allow him to use a wheelchair to visit the psychologist she had recommended for him.  (*Id.* at 36).  The Court will address each allegation in turn.

### a.  Confiscation of Plaintiff's Sulfasalazine

Nurse Martinez testified that Dr. Fortner had written the order to discontinue Plaintiff's Sulfasalazine due to the hoarding allegation.  (Martinez depo. at 184-86, Plaintiff's App'x. 106-07).  Dr. Fortner also testified that Plaintiff had been caught hoarding his medication, and he took it away from him because it was not "that essential."  (Fortner depo. at 143-44, Plaintiff's App'x. 45).  Plaintiff has presented no evidence that Nurse Martinez was responsible for taking away the medication.  Accordingly, Nurse Martinez is entitled to summary judgment as to this allegation.

**b.  Failure to Monitor Plaintiff in January and February 2008 and Allow Him to See Dr. Fortner**

On the record before the Court, the undersigned finds that Plaintiff has met the deliberate indifference standard because he has presented sufficient evidence to demonstrate that Nurse Martinez was subjectively aware that his condition was worsening over the course of the six weeks at issue, and she nevertheless refused his repeated requests for medical attention.  *Brown*, Case No. 11-30082, manuscript op. at 6.  Specifically, Nurse Martinez admitted that she did not monitor Plaintiff's health between January 2, 2008, when he first saw Dr. Fortner, and February 14, 2008 when Dr. Fortner referred him to a specialist.  (Martinez depo. at 77-78, 86-87, 90-91, 105-07, 112, Plaintiff's App'x. 84-85, 87-88, 91-93).  Plaintiff testified that during this timeframe, he repeatedly asked Nurse Martinez (and others) to let him see Dr. Fortner, but his requests were refused even though his symptoms were worsening, he was losing weight, and he had to use the bathroom all day.  (Smith depo. at 44-55, 79-81, 98-101, Plaintiff's App'x. 130, 137, 140).  He also stated that he gave Nurse Martinez graphic descriptions of his symptoms and asked if he could give her a stool sample, but she refused.  (Smith depo. at 100-01, Plaintiff's App'x. 140).  On the other hand, Nurse Martinez testified that as far as she could recall, she did not learn that Plaintiff's condition had deteriorated after his January 2, 2008 visit until he came back to see Dr. Fortner on February 14, 2008.  (Martinez depo. at 86, Plaintiff's App'x. 87).

There is thus a material issue of fact in dispute as to whether Nurse Martinez was subjectively aware of the deterioration of Plaintiff's condition.  *Brown*, Case No. 11-30082, manuscript op. at 6.  Further, a reasonable jury could find that Nurse Martinez actually drew the inference that a substantial risk of serious harm existed to Plaintiff given that Plaintiff testified

36

that she repeatedly refused to allow him to see Dr. Fortner during this timeframe, despite him

asking repeatedly and graphically detailing his symptoms to her. *Id.* Plaintiff also testified that

his illness was obvious because he had lost a lot of weight and had yellow bags under his eyes.

(Smith depo. at 56, 82, Plaintiff's App'x. 131, 138). Finally, there is sufficient evidence such

that a jury could find that Nurse Martinez's failure to respond to the risk of harm indicated that

she subjectively intended that the harm occur. *Brown*, Case No. 11-30082, manuscript op. at 6.

Taking Plaintiff's facts as true, he has satisfied the deliberate indifference standard at the

summary judgment stage as to this episode.

### c. Scheduling Delays

Plaintiff contends that Nurse Martinez was responsible for the 12-day scheduling delay in

his initial appointment with Dr. Staniunas, as well as for the 19- to 20-day delay for getting a

colonoscopy. However, Nurse Martinez testified that the 12-day delay was caused by the jail's

requirement that she consult with the county indigent health officer to find a specialist who

would agree to treat an inmate. (Martinez depo. at 40-41, 102-04, 116, Plaintiff's App'x. 78, 91,

94). Once she and the county health officer located a specialist, Nurse Martinez testified that she

contacted Captain Compton to handle transporting Plaintiff. (Martinez depo. at 41, Plaintiff's

App'x. 78). Although Plaintiff speculates that the delay was Nurse Martinez's fault, his

conclusion is merely guesswork and is not sufficient to overcome Nurse Martinez's summary

judgment argument on this point. *Int'l Shortstop, Inc.*, 939 F.2d at 1266.

As for the 19 to 20 delay in getting Plaintiff in for his colonoscopy, Nurse Martinez

testified that she was unsure of the cause of the delay. (Martinez depo. at 119, Plaintiff's App'x.

95; Martinez depo. at 40, Deft's App'x. 116). Dr. Fortner assumed that the delay was caused by

Dr. Staniunas, but was not sure.  (Fortner depo. 89, Plaintiff's App'x. 33).  A clinic note from the

jail dated the same day that Plaintiff was first seen by Dr. Staniunas states that "Dr. Staniunas

will call us for an appt for the inmate in the Dallas office for a colonoscopy."  (Doc. 47, Deft's

App'x. 45).  Based on this evidence, the Court cannot find that Nurse Martinez acted with

deliberate indifference or that she was even personally responsible for the delay.  *Brown*, Case

No. 11-30082, manuscript op. at 6.

      **d.  Failure to Monitor Plaintiff After First Hospitalization**

      Additionally, Plaintiff urges, after he returned from his first hospitalization, Nurse

Martinez failed to monitor his health status and provide him with a working Cortifoam packet to

keep his ulcerative colitis in remission.  Nurse Martinez admitted that upon Plaintiff's release

back to the jail, she did not monitor his health status; jail clinic notes indicated that Plaintiff had

a faulty Cortifoam dispenser, and she did not know if he had been given a new one, although

there was a clinic note that said it had been reordered.  (Martinez depo. at 32-33, 122-23, 130,

158, Plaintiff's App'x. 76, 96, 98, 104).  Based on the sparse evidence on the record, the Court

cannot find that Nurse Martinez acted with subjective deliberate indifference to Plaintiff's

medical needs by failing to be more proactive in monitoring him and get him a working

Cortifoam dispenser.  Nor can the Court find that Nurse Martinez subjectively intended that

Plaintiff be subject to harm.  *Brown*, Case No. 11-30082, manuscript op. at 6.

      **e.  Failure to Monitor Plaintiff After Surgery**

      Plaintiff's final complaints against Nurse Martinez are that she failed to monitor his

health after his surgery, which led to an incident where he laid in his own feces for an extended

time, and that she denied him the use of a wheelchair so he could see a jail psychologist.  The

record evidence indicates that at 6:30 a.m. on May 21, 2008, Plaintiff was discovered by a nurse

lying in his feces.  (Smith depo. at 101, Plaintiff's App'x. 140; Martinez depo. at 145-48, Def't's

App'x. 100-01; Fortner depo. at 164-65, Plaintiff's App'x. 47; Fortner Ex. 38, Plaintiff's App'x.

57).  Nurse Martinez averred that her shift did not start until 8:00 a.m.  (Martinez depo. at 147-

48, Def't's App'x. 119-20).  Plaintiff testified that he nevertheless believed Nurse Martinez was

responsible because she oversaw the jail's medical staff.  (Smith depo. at 101, Plaintiff's App'x.

140).

  There is no evidence to suggest that Nurse Martinez participated in this particular alleged

constitutional violation or that she implemented unconstitutional policies that resulted in the

alleged violation.  *Gates*, 537 F.3d at 435.  Based on the above facts, Plaintiff has not shown that

Nurse Martinez was subjectively aware of the risk of serious harm to him and that she

disregarded that risk.  *Brown*, Case No. 11-30082, manuscript op. at 6.  Further, there is no

evidence to suggest that Nurse Martinez drew the inference that a substantial risk of serious harm

existed as to Plaintiff following his return from hospitalization and, given her limited interactions

with Plaintiff after that time, the Court cannot find that the substantial risk of harm to Plaintiff

was so obvious as to allow an inference to be drawn that Plaintiff was at risk.  *Id.*; *see also*

*Farmer*, 511 U.S. at 842-43.

  As for Plaintiff's complaint that Nurse Martinez refused to let him use a wheelchair to

attend a psychologist appointment eight days after his surgery and one day after he had been

vomiting all night, Nurse Martinez averred that based on her experience and knowledge, a

patient's recovery rate is improved if the patient moves around and walks.  (Martinez depo. at

134-36, Plaintiff's App'x. 99).  While Plaintiff contends that he was in too much pain to walk,

his dispute with Nurse Martinez on this point is essentially a difference of medical opinion which is not actionable under section 1983. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Accordingly, Nurse Martinez is entitled to summary judgment as to these allegations.

    *3.    Dr. Fortner*

**a.  Statute of Limitations**

Dr. Fortner first argues that Plaintiff's claim is barred by the two-year statute of limitations because it accrued, at the latest, in March 2008 when he was hospitalized for the first time, but Plaintiff did not file his complaint until April 2010. (Doc. 61 at 13-16).

Plaintiff responds that his claim is not barred by the statute of limitations because he was not aware of the permanence of his injury until May 2008 when he had the colectomy procedure. (Doc. 65 at 22-23). Thus, he maintains, his claim is timely under the continuing violation doctrine. (*Id.* at 23-25). Dr. Fortner replies that the continuing violation doctrine does not render Plaintiff's complaint timely because Plaintiff had reason to know of his injury and the cause thereof prior to April 7, 2008. (Doc. 68 at 1-7).

In section 1983 actions, a federal district court applies the forum state's personal injury statute of limitations. *Owens v. Okure*, 488 U.S. 235, 240-41 (1989). Texas has a two-year statute of limitations for personal injury actions. TEX. CIV. PRAC. & REM. CODE § 16.003(a). While state law determines the limitations period under section 1983, federal law dictates when a cause of action is deemed to have accrued. *Watts v. Graves*, 720 F.2d 1416, 1423 (5th Cir. 1983). The federal standard provides that a cause of action accrues when a plaintiff "knows or has reason to know of the injury which is the basis of the action." *Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980); *see also Walker v. Epps*, 550 F.3d 407, 414 (5th Cir. 2008)

40

(providing that an action accrues when a plaintiff can file suit and obtain relief).

If some injury is discernible when the tortious act occurs, the plaintiff's cause of action is deemed to have accrued.  If the plaintiff later discovers that his injuries are worse than originally thought, his cause of action nevertheless accrues on the earlier date when he realized that he had sustained harm.  *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 229, 232-33 (5th Cir. 1984) (holding that the plaintiff's claims were time-barred when he suffered a headache, nausea, and blackouts immediately after being exposed to a toxin, but did not file suit until well after the statute of limitations had expired and he learned that he had sustained additional, much more serious injuries).  In a medical malpractice case, the statute of limitations begins to run when the plaintiff is, or should be, aware of both the injury and its connection with the acts of the defendant.  *Lavellee*, 611 F.2d at 1131.

However, the continuing violation tolling doctrine provides an exception to the above rules.  In applying a forum state's statute of limitations, a federal court must give effect to any applicable state law tolling provisions unless doing so would be inconsistent with the policies underlying section 1983.  *Board of Regents of University of State of New York v. Tomanio*, 446 U.S. 478, 485-86 (1980).  The Texas Supreme Court has not yet directly addressed the viability of the continuing violation doctrine.  *General Universal Systems, Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007).  In the absence of Texas Supreme Court pronouncements, however, the federal courts generally defer to the holdings of lesser state courts.  *Owen v. United States*, 935 F.2d 734, 738-39 (5th Cir. 1991).  Texas intermediate appellate courts have frequently applied the continuing violation doctrine.  *Burke v. Union Pacific Resources Co.*, 138 S.W.3d 46, 58 (Tex.App.–Texarkana 2004); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson*

*Improvement Corp.*, 53 S.W.3d 799, 812 (Tex.App.–Austin 2001); *First Gen. Realty Corp. v.*

*Maryland Cas. Co.*, 981 S.W.2d 495, 501 (Tex.App.–Austin 1998); *Upjohn Co. v. Freeman*, 885

S.W.2d 538, 542 (Tex.App.–Dallas 1994); *see also Pete v. Metcalfe*, 8 F.3d 214, 218 (5th Cir.

1993) (noting that Texas courts have recognized the continuing tort doctrine).   Furthermore,

continuing tort law has been applied in section 1983 cases in this circuit.  *Jackson v. Galan*, 868

F.2d 165, 168 (5th Cir. 1989); *Smith v. Avance*, 553 F.Supp. 434 (E.D. Tex.), *aff'd*, 683 F.2d

415, 437-38 (5th Cir. 1982).   Thus, applying the doctrine in this section 1983 action would not

appear to be inconsistent with the policies underlying section 1983, and the undersigned will

consider the doctrine's applicability to the case at bar.  *Tomanio*, 446 U.S. at 485-86.

     A continuous tort involves wrongful conduct that is repeated until ceased; while in the

more typical case, the wrongful conduct occurs on one day and the suffering continues to occur

thereafter over time.  *Arquette v. Hancock*, 656 S.W. 627, 629 (Tex.App. 1983).  In a continuing

tort case, each day creates a separate cause of action.  *Id.*  Thus, a cause of action for a continuing

tort does not accrue until the defendant's tortious acts cease.  *First Gen. Realty Corp. v.*

*Maryland Cas. Co.*, 981 S.W.2d 495, 501 (Tex. App.– Austin 1998); *Harrison v. Cockrell*, 2003

WL 102447 *4 (N.D. Tex. 2003) (Solis, J.) (noting that summary dismissal was not warranted

where section 1983 plaintiff alleged continuing violations of his constitutional rights).

Accordingly, where a prisoner filed a section 1983 complaint alleging that prison officials had

denied him his afternoon dosage of blood pressure medication "90% of the time," from June

1997 to September 1998, this was sufficient to allege a continuing tort and render the prisoner's

complaint timely filed.  *Beasley v. Sawyer*, 2001 WL 257924 *2 (N.D. Tex. 2001) (Kaplan,

M.J.), *aff'd*, 275 F.3d 43 (5th Cir. 2001) (Table).

In the case at bar, the Court finds that Plaintiff adequately has demonstrated that Dr. Fortner engaged in a course of conduct, rather than a lone act, in treating Plaintiff from January 2008 through at least May 2008.  *Id.*  Because Plaintiff filed his complaint in April 2010, it is timely as his cause of action did not accrue until Dr. Fortner's allegedly unconstitutional actions ceased.  *First Gen. Realty Corp.*, 981 S.W.2d at 501.

### b.  Merits of Plaintiff's Claims

Dr. Fortner urges that he was not at fault for the May 2008 flare-up that led to Plaintiff's colectomy because Plaintiff was under Dr. Staniunas's care following his April 2008 discharge from his first hospital stay.  (Doc. 61 at 15).  Further, Dr. Fortner contends that he was not deliberately indifferent to Plaintiff's medical needs because he prescribed Prednisone to Plaintiff at Plaintiff's first visit on January 2, 2008, and Plaintiff had never been prescribed 20 milligrams of Prednisone for either of his two prior flare-ups and did not know it would not work.  (*Id.* at 18).  Dr. Fortner argues that he gave a lower dose of Prednisone than Plaintiff requested because he was concerned about the side effects, but he did increase the dosage over time.  (*Id.* at 19, 21-22).  He also maintains that if Plaintiff was still sick, he could have requested to see Dr. Fortner at any time, and such requests were never refused.  (*Id.* at 22).

Initially, Plaintiff contends that Dr. Fortner is not entitled to assert a qualified immunity defense because he was merely a part-time contract doctor for the jail.  (Doc. 65 at 26-28).  In any event, Plaintiff urges, Dr. Fortner's conduct did violate Plaintiff's constitutional right to adequate medical care.  (*Id.* at 28-29).  In particular, Dr. Fortner was aware of Plaintiff's serious medical condition and has not even attempted to justify his failure to monitor Plaintiff or obtain timely treatment for him.  (*Id.* at 29-31).  Further, Plaintiff argues that Dr. Fortner's attempt to

shift blame to Dr. Staniunas is meritless because Plaintiff only had direct access to Dr. Staniunas when he was hospitalized, and otherwise Dr. Fortner was responsible for his health care. (*Id.* at 31-34). Plaintiff also contends that Dr. Fortner admitted that he did not follow the protocol dictated by the American Family Physician article that he claimed to have relied on in treating Plaintiff, and he unreasonably delayed in obtaining outside treatment for Plaintiff. (*Id.* at 35-39).

In reply, Dr. Fortner contests the declaration of Dr. Jacobson, urging that Dr. Jacobson never specifically discussed Dr. Fortner in the declaration, ignored the medical evidence that stated Plaintiff had only mild colitis, and applied a negligence standard that is inapposite to deliberate indifference cases. (Doc. 68 at 9-10).

As an initial matter, Dr. Fortner is entitled to assert a qualified immunity defense because he contracted with the county to provide medical services to the jail's inmates. *West v. Atkins*, 487 U.S. 42, 55-56 (1988). Nevertheless, the Court rejects Dr. Fortner's argument that Dr. Staniunas was solely responsible for Plaintiff's health care from April 2008 forward because Plaintiff only had direct access to Dr. Staniunas when he was hospitalized. After Plaintiff was released from the hospital, Dr. Fortner was responsible for his health care although he and/or his staff may have been consulting with Dr. Staniunas as well. *See id.* at 55 (noting that "[i]t is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care [the prisoner] could receive for his injury was that provided by the State.").

i. January 2, 2008 through February 14, 2008

Dr. Fortner admitted that a patient with ulcerative colitis and blood in his stools is not a "minor problem." (Fortner depo. at 77, Plaintiff's App'x. 31). Although Dr. Fortner argues that he was not deliberately indifferent to Plaintiff's medical needs because he prescribed 20

44

milligrams of Prednisone to Plaintiff at Plaintiff's first visit in January 2008, Dr. Fortner admittedly did not monitor Plaintiff thereafter for a period of six weeks, and by the time he did see him, Plaintiff "looked sick and was acutely ill." (Fortner depo. at 74-75, Plaintiff's App'x. 31). Such a delay could give rise to a constitutional violation because Plaintiff was substantially harmed as a result, in that he had to be hospitalized for a three-week period. *Mendoza*, 989 F.2d at 195.

Plaintiff's case is similar to *McDonald v. Dallas County*, in which an inmate suffered an eye injury, did not see a doctor until six days later, was taken to the emergency room and diagnosed with a retinal tear two days later, but did not attend a preoperative appointment scheduled for four days later. 2008 WL 918286 at *1-2 (N.D. Tex. 2008) (Lindsay, J.). Ultimately, and despite his complaints, he did not receive surgery until 48 days later, resulting in the loss of eyesight in his left eye. *Id.* at *1-2, 5. The court in *McDonald* concluded that, under these facts, the plaintiff had raised a genuine issue of material fact with respect to jail employees' subjective deliberate indifference to his medical needs. *Id.* at *5.

In the case at bar, 43 days elapsed before Dr. Fortner allowed Plaintiff to be sent to a specialist, even though he was aware that Plaintiff had a serious medical condition. And, considering the facts in the light most favorable to Plaintiff, Plaintiff repeatedly asked for medical care for his worsening condition. Moreover, while Dr. Fortner testified that he was concerned about the side effects of Prednisone, he did not monitor Plaintiff after prescribing the medicine and, in fact, increased his dosage twice without seeing him. (Fortner depo. Ex. 27, Plaintiff's App'x. 56; Fortner depo. at 58-62, 65-66, 73-76, Plaintiff's App'x. 27-31; *see also* Clinic Visit Note at Deft's App'x. 40). Based on similar facts, the *McDonald* court denied the

45

defendants' motion for summary judgment because the "facts, taken in the light most favorable to McDonald, could rise to the level of deliberate indifference."  2008 WL 918286 at *5.

Further, Dr. Jacobson's declaration creates a fact question as to whether Dr. Fortner's failure to prescribe an adequate dosage of Prednisone over a long enough period of time or send Plaintiff to a specialist sooner "presented an obvious risk of harm."  (Jacobson Dec., App'x. 1); *see also Farmer*, 511 U.S. at 842-43; *Baker v. Bowles*, No. 3:05-CV-1118-L, 2006 WL 740269, *2-3 (N.D. Tex. Mar. 13, 2006) (Lindsay, J.) (delay of eye surgery recommended by an outside specialist).  This is underscored by Dr. Fortner's admission that he did not follow the protocol he claimed to have relied on in treating Plaintiff or even ask about Plaintiff's pain or weight loss because he did not have time.  (Fortner depo. at 30-32, 34, 37, 45, 49-50, 62-66, 69, 91-92, Plaintiff's App'x. 20-21, 23-25, 28-29, 34, 38; *Ulcerative Colitis: Diagnosis and Treatment*, AMERICAN ACADEMY OF FAMILY PHYSICIANS (2007) at Plaintiff's App'x. 4-11).

Moreover, although Dr. Fortner denied it, Plaintiff testified that Dr. Fortner berated him at his initial visit when he asked to a specialist, shouting that Plaintiff's request was "ridiculous," and he should not have committed a crime if he was concerned with seeing a specialist.  (Fortner depo. at 107, Plaintiff's App'x. 37; Smith depo. at 119, Plaintiff's App'x. 143; *see also* Plaintiff's sworn *Statement of Claim*, Doc. 9 at 2).  If true, this could constitute evidence that Dr. Fortner was deliberately indifferent to Plaintiff's medical needs and intended that harm occur. *Brown*, Case No. 11-30082, manuscript op. at 6.  In fact, Dr. Fortner stated that he did not like the jail's policy of having to see inmates for routine problems for which over-the-counter medicine was warranted because "it was a waste of my time."  (Fortner depo. at 99, Plaintiff's App'x. 36).  He also evidenced his belief that inmates generally were not truthful when he

testified that "inmates tell lies when they tell you they've lost a lot of weight.  It happens a lot. . .

Mr. Smith has lied about things.  He may have been lying about that."  (Fortner depo. at 41, 54,

Plaintiff's App'x. 22, 26).  Further, Dr. Fortner stated that sometimes the nurses brought so many

inmates to see him that he "wished they would refuse to let them come in.  Because sometimes

it's just almost nothing."  (Fortner depo. at 77, Plaintiff's App'x. 31).

On these facts, Plaintiff has presented evidence that Dr. Fortner was subjectively aware

that Plaintiff had a serious medical condition, yet he failed to monitor him despite his concerns

about administering Prednisone.  *Brown*, Case No. 11-30082, manuscript op. at 6.  Further, a

reasonable jury could find that Dr. Fortner actually drew the inference that a substantial risk of

serious harm existed to Plaintiff given that Plaintiff testified that he had begged Dr. Fortner to

see a specialist and for a higher dosage of Prednisone, but Dr. Fortner refused both requests and

berated Plaintiff.  *Id.*  Finally, there is sufficient evidence such that a jury could find that Dr.

Fortner's response to the risk of harm indicated that he subjectively intended that the harm occur.

*Id.*  Evidence of such indifference to Plaintiff's medical needs is sufficient to overcome Dr.

Fortner's summary judgment motion because the deliberate indifference resulted in substantial

harm, namely Plaintiff's hospitalization for three weeks.  *Estelle*, 429 U.S. at 104-05; *Mendoza*,

989 F.2d at 195; *see also Easter*, 467 F.3d at 459 (defendants' knowledge of an inmate's serious

medical condition and failure to treat it properly allows an inference that the defendants were

"subjectively aware of a substantial risk of harm" to the inmate's health).

Further, although Dr. Fortner contended that prisoners' requests to see him were never

refused and Plaintiff could have seen him any time if he was getting sicker, Plaintiff testified that

from early January through mid-February, he repeatedly asked Nurse Martinez and others at the

jail to let him see Dr. Fortner and a specialist, but his requests were refused.  (Smith depo. at 44-55, 98-101, Plaintiff's App'x. 130, 140; Fortner depo. at 76-77, Plaintiff's App'x. 31); *see also* Dr. Fortner depo. at 78-80, Exh. 14 (note indicating that Plaintiff had asked to see Dr. Fortner on 2/26/08 due to blood in his stool, and Dr. Fortner told the reporting officer to have Plaintiff follow up with Nurse Martinez the next day)).  Plaintiff also averred that he had put in numerous written sick call requests at least twice a week during this timeframe, but later there would be no record of it.  (Smith depo. at 98-99, Plaintiff's App'x. 140).  This evidence raises a disputed issue of fact as to whether Plaintiff's access to Dr. Fortner was as readily available as Dr. Fortner contends, further warranting the denial of summary judgment.  *See Reeves*, 530 U.S. at 150.

    ii.  Failure to Ensure that Plaintiff Timely had a Colonoscopy

    While Plaintiff argues that Dr. Fortner "did nothing" to see that Plaintiff timely underwent the colonoscopy ordered by Dr. Staniunas, both Nurse Martinez and Dr. Fortner testified that they were unsure of the cause of the delay, but Dr. Fortner assumed that the delay was caused by Dr. Staniunas.  (Fortner depo. 89, Plaintiff's App'x. 33; Martinez depo. at 119, Plaintiff's App'x. 95; Martinez depo. at 40, Deft's App'x. 116).  A clinic note from the jail dated the same day that Plaintiff was first seen by Dr. Staniunas states that "Dr. Staniunas will call us for an appt for the inmate in the Dallas office for a colonoscopy."  (Doc. 47, Deft's App'x. 45). Based on this evidence, the Court cannot find that Dr. Fortner acted with deliberate indifference or that he was personally responsible for the delay.  *Brown*, Case No. 11-30082, manuscript op. at 6.

    iii.  Failure to Monitor Plaintiff After First Hospitalization

    Upon Plaintiff's release back to the jail following his three-week stay, Dr. Fortner did not

(1) monitor his health status, (2) speak to any of his doctors, (3) know whether Plaintiff had ever received his suppository Cortifoam or his prescribed low-fiber diet, (4) know whether Plaintiff had his follow-up appointments with the hospital doctors, received any of his prescription or over-the-counter drugs, or had physician-ordered blood tests performed, or (5) know when Plaintiff's condition deteriorated to the point that he had to be hospitalized again for an ileostomy.  (Fortner depo. at 113-16, 118-26, Plaintiff's App'x. 38-42).

Dr. Fortner did see Plaintiff on April 15, four days after he got out of the hospital, but did not determine the number of stools per day Plaintiff was having, ask whether Plaintiff had blood in his stools, or take his body temperature.  (Fortner depo. at 127-28, Plaintiff's App'x. 42).  Dr. Fortner stated that Plaintiff was expected to have blood in his stools a lot so he had no reason to doubt that was happening.  (Fortner depo. at 127-28, Plaintiff's App'x. 42).  He testified that Nurse Martinez was supposed to be following the hospital doctors' orders at that point, and he thought she was doing so.  (Fortner depo. at 111-12, Plaintiff's App'x. 38).

Following a three-week delay, Dr. Fortner next saw Plaintiff on May 8, 2008, because Plaintiff was complaining of frequent bloody stools.  Dr. Fortner did not ask about the number of stools per day Plaintiff was having, ask whether Plaintiff had blood in his stools, or take his body temperature.  (Fortner depo. at 126-28, Plaintiff's App'x. 42).  However, Dr. Fortner did tell Nurse Martinez to call Dr. Staniunas, who ordered a colonoscopy and stated that Plaintiff might thereafter have to "go straight to the hospital for surgery."  (Fortner depo. at 126, Plaintiff's App'x. 42; Deft's App'x. 49).

This delay in treatment and failure to monitor Plaintiff, following his three-week hospitalization for a serious medical condition, is evidence of indifference to Plaintiff's medical

needs sufficient to overcome Dr. Fortner's summary judgment motion.  *Estelle*, 429 U.S. at 104-05.  Moreover, there is evidence to suggest that the deliberate indifference resulted in substantial harm, namely Plaintiff's colectomy on May 14, 2008.  *Mendoza*, 989 F.2d at 195.  The evidence indicates that Plaintiff had the surgery because his disease had spread throughout his large intestine and been unresponsive to medical therapy, so surgery was the only resort.  (Smith depo. at 87-88, Plaintiff's App'x. 139; *see* May 12, 2008 note from Dr. Staniunas that Plaintiff "has been refractory to medical therapy and wishes to proceed with colectomy" at Deft's App'x. 50; Doc. 10 p. 43 (May 14, 2008 note from Dr. Staniunas that Plaintiff has been "refractory to maximal medical therapy")).  Although Dr. Fortner argues that there is evidence demonstrating that Plaintiff's surgery was elective, there is a material question of fact in that regard in light of the remaining evidence of record.  *See Reeves*, 530 U.S. at 150.

## IV.  CONCLUSION

For the reasons set forth above, the undersigned recommends that Defendants' *Motions for Summary Judgment* (Doc. 46; Doc. 61) be **GRANTED IN PART AND DENIED IN PART**.

**SO RECOMMENDED** on December 14, 2011.


RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE